[Cite as *State v. Kaufhold*, 2020-Ohio-3835.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-09-148 |
| | : | O P I N I O N |
| - vs - | | 7/27/2020 |
| | : | |
| DAVID T. KAUFHOLD, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2018-11-2011

Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Santen & Hughes, H. Louis Sirkin, 600 Vine Street, Suite 2700, Cincinnati, Ohio 45202, for appellant

**S. POWELL, J.**

{¶ 1} Appellant, David T. Kaufhold, appeals his conviction in the Butler County Court of Common Pleas after a jury found him guilty of rape and sexual battery. Kaufhold also appeals the trial court's decision to sentence him to a mandatory seven-year prison term for the charge of rape. For the reasons outlined below, we affirm Kaufhold's conviction.

{¶ 2} On November 20, 2018, the Butler County Grand Jury returned an indictment

charging Kaufhold with rape in violation of R.C. 2907.02(A)(1)(c), a first-degree felony, and sexual battery in violation of R.C. 2907.03(A)(2), a third-degree felony. The charges arose after it was alleged Kaufhold had vaginal intercourse with the victim, P.C., when her ability to resist or consent was substantially impaired as a result of her becoming intoxicated by drugs and/or alcohol while she and Kaufhold were on a dinner date on the evening of June 26, 2016.

{¶ 3} The matter ultimately proceeded to a four-day jury trial that concluded on June 28, 2019. At trial, the jury heard testimony from 13 witnesses. This included testimony from Kaufhold, P.C., P.C.'s son ("J.C."), P.C.'s daughter-in-law ("W.B.C."), two nurses who treated P.C. for her injuries, and the state's expert witness, the chief toxicologist with the Hamilton County Coroner's Office. After hearing this testimony, the jury returned a verdict finding Kaufhold guilty as charged on both the rape and sexual battery offenses.

{¶ 4} On August 27, 2019, the trial court held a sentencing hearing. During this hearing, the trial court determined the rape and sexual battery offenses were allied offenses of similar import that merged for purposes of sentencing. The state electing to proceed on the charge of rape, the trial court sentenced Kaufhold to serve a mandatory seven-year prison term for rape. The trial court also ordered Kaufhold to pay a fine, classified Kaufhold as a Tier III sex offender, and notified Kaufhold that he would be subject to a five-year postrelease control term following his release from prison. Kaufhold now appeals, raising six assignments of error for review.

{¶ 5} Assignment of Error No. 1:

{¶ 6} THE TRIAL COURT ERRED IN OVERRULING MR. KAUFHOLD'S MOTION FOR JUDGMENT OF ACQUITTAL.

{¶ 7} In his first assignment of error, Kaufhold argues the trial court erred by denying his Crim.R. 29(A) motion for acquittal. Kaufhold also argues his conviction was against the

manifest weight of the evidence. We disagree.

{¶ 8} The standard of review for a denial of a Crim.R. 29(A) motion for acquittal is the same as the standard of review for a sufficiency of the evidence claim. *State v. Robinson*, 12th Dist. Clermont No. CA2015-01-013, 2015-Ohio-4533, ¶ 37.

{¶ 9} Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33.

{¶ 10} Unlike a challenge to the sufficiency of the evidence, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, an appellate court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler

Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 11} As noted above, the jury found Kaufhold guilty of rape in violation of R.C. 2907.02(A)(1)(c). Pursuant to that statute, "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender" when (1) "the other person's ability to resist or consent is substantially impaired because of a mental or physical condition" and (2) "the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *."

{¶ 12} The jury also found Kaufhold guilty of sexual battery in violation of R.C. 2907.03(A)(2). Pursuant to that statute, "[n]o person shall engage in sexual conduct with another, not the spouse of the offender" when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." As defined by R.C. 2907.01(A), the term "sexual conduct" includes vaginal intercourse between a male and female.

{¶ 13} Kaufhold does not dispute that he and P.C. had sex on the evening of June 26, 2016. Kaufhold instead argues that (1) the sex was consensual, or (2) if not consensual, there was no evidence to indicate he either knew or had reasonable cause to believe P.C.'s ability to resist or consent was substantially impaired as a result of her becoming intoxicated by drugs and/or alcohol before they had sex.

{¶ 14} As defined by R.C. 2901.22(B), a person acts knowingly when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." The statute also provides that "[a] person has knowledge of circumstances when the person is aware that such circumstances probably

- 4 -

exist." *Id.* "Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself." *State v. Hilton*, 12th Dist. Butler No. CA2015-03-064, 2015-Ohio-5198, ¶ 20, citing *State v. Robinson*, 12th Dist. Fayette No. CA2005-11-029, 2007-Ohio-354, ¶ 18. This is because "the intent of an accused person is only in his mind and is not ascertainable by another * * *." *State v. Blanton*, 12th Dist. Madison No. CA2005-04-016, 2006-Ohio-1785, ¶ 22, quoting *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist.2001).

{¶ 15} Although not defined by the Ohio Revised Code, "'the phrase 'substantially impaired' * * * must be given the meaning generally understood in common usage.'" *State v. Kilbarger*, 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 10, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103 (1987). "The Ohio Supreme Court has held that 'substantial impairment' must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of her conduct or to control her conduct." *State v. Anglin*, 12th Dist. Butler No. CA2018-03-058, 2019-Ohio-588, ¶ 16, citing *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). "Substantial impairment may be proven by the victim's own testimony." *Id.* at ¶ 17.

{¶ 16} Substantial impairment may also "be proven by the testimony of persons who had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control [his or] her conduct." *State v. Z.G.B.*, 12th Dist. Warren No. CA2016-04-029, 2016-Ohio-7195, ¶ 15, citing *State v. Bai*, 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206, ¶ 54. "A substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder." *State v. Kilbarger*, 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 11. This is necessary given the fact that "there can be a fine, fuzzy, and subjective line between

intoxication and impairment." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, ¶ 23 (2d Dist.), quoting *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶18.

{¶ 17} After a full and thorough review of the record, we find the state provided extensive evidence to prove P.C. did not consent to having sex with Kaufhold. The state also provided extensive evidence that, if believed, proved Kaufhold either knew or had reasonable cause to believe P.C.'s ability to resist or consent was substantially impaired as a result of her becoming intoxicated by drugs and/or alcohol. This includes evidence indicating Kaufhold knew P.C. had consumed one alcoholic beverage before he arrived at the restaurant for their dinner date, as well as evidence indicating Kaufhold knew P.C. then drank one, and possibly two, more alcoholic beverages at the restaurant during their date.

{¶ 18} After consuming the second of these three alcoholic beverages, P.C. testified that she told Kaufhold that the drinks were making her "really woozy right now." However, rather than telling P.C. to stop drinking, P.C. testified that Kaufhold instead told her that she "will be fine" and instructed her to eat some of the appetizer she had ordered for the table. P.C. testified that Kaufhold also told her to keep drinking the last of the three alcoholic beverages, telling her to "drink this," "[y]ou've got to drink this," "[h]ave a sip, have a sip, you have to drink this one."

{¶ 19} Because the alcoholic beverages were making her feel "really woozy," P.C. testified that she stood up from the table and told Kaufhold that she did not "feel good." When asked what happened next, P.C. testified that the next thing she remembers is "waking up" face down on a mattress in what she later learned was Kaufhold's bedroom feeling "just terrible," "excruciating pain" in her vagina and anus "telling [Kaufhold] to get off [her]." P.C. testified that she then "laid there to try to get energy" before grabbing her clothes off of the bedroom floor and going to the bathroom.

{¶ 20} Once in the bathroom, P.C. testified that it took her "forever" to get dressed,

that she "couldn't get her pants on," and that she "never did put [her] shoes on." P.C. also testified that she "just couldn't * * * walk." However, although generally unable to walk, P.C. testified that she eventually made it back into the bedroom where she "just fell back on the mattress." P.C. testified that Kaufhold then came back into the bedroom "and he said, oh no. You are not staying here. You are going home." To this, P.C. testified that she responded, "okay."

{¶ 21} P.C. testified that Kaufhold then helped her up from the mattress and escorted her outside to his truck where she "passed out again." When asked what happened next, P.C. testified that the next thing she remembers is being dropped off at her car outside the restaurant where she met Kaufhold for dinner earlier that evening. Upon being dropped off at her car, P.C. testified that she then stood by her car and watched as Kaufhold drove away. P.C. testified that at that time she did not know where her purse, or her keys, "or anything was."

{¶ 22} P.C. testified that she was eventually able to locate her belongings "over to the right of [her]," but that her "glasses were broke." P.C. then testified that she got into her car and locked the door. P.C. testified that she then "tore [her] purse up" looking for her phone. Upon finding her phone, P.C. testified that she "went to call [her] niece," but instead accidentally called her son, J.C. "And I heard my son's voice. And he said, mom. And I said [J.C.], I think I've been raped. And he said, what? And I said I think I've been raped."

{¶ 23} P.C. testified that she then drove away from the restaurant and out onto the street towards the freeway. At this time, P.C. testified that she was still on the phone with her son, J.C., and later her daughter-in-law, W.B.C. Describing this call, P.C. testified:

> [W]e kept getting disconnected and [J.C.] kept calling me back. And I had already started driving and when he called back the one time, he said I want you to talk to [W.B.C.], who is my daughter-in-law. And she said, [P.C.], where are you at? And I said, I don't know. I said I'm going home. I said I don't know.

And she said, pull over. We'll find you. Pull over. I said, no, I'm
too scared. I said I want to go home.

{¶ 24} P.C. testified that the conversation between her and W.B.C. continued as follows:

And [W.B.C.] said, no. Pull over. And then she started yelling,
pull over. Pull over. And I said I am just passing [the freeway],
like that. And she said, pull over now. And I said no, I will make
it to [the next town off the freeway]. I said I think I can make it
to [that town]. She said I'm going to stay on the phone with you.
And I said I will pull over when I get to [that town]. And I don't
remember driving across the ramp, but I made it to [the town].

{¶ 25} Once there, P.C. testified that she pulled over in a drug store parking lot and "passed out again" while she waited for J.C. and W.B.C. to arrive and take her to the hospital. Asked to explain what happened next, P.C. testified that the next thing she remembers is J.C. opening her car door and picking her up "like a ragdoll and carrying [her] to his car, literally carrying [her] to his car." P.C. testified that she then "passed out again" while W.B.C. drove her "straight to the hospital."

{¶ 26} P.C.'s testimony was corroborated by testimony from both her son, J.C., and her daughter-in-law, W.B.C. J.C. testified that an "upset" P.C. called him and told him that she had just been raped. To this, J.C. testified that he told P.C. that he and W.B.C. would come get her and take her to the hospital. J.C. testified that he and W.B.C. then left their house and started driving to P.C. J.C. testified that he and W.B.C. eventually located P.C. approximately 15 to 20 minutes later "slumped over" in her car parked in a drug store parking lot. Explaining further what he saw when first contacting P.C., J.C. testified:

I pulled up – pulled up behind –pulled up beside her and got out.
Opened her car door, and she was crouched over in the driver's
seat. And obviously, I couldn't understand anything she was
saying. So I just picked her up over my –picked her up out of
the car, and put her over my shoulder, and carried her to my
vehicle. And that's when we went to [the hospital].

{¶ 27} J.C. also testified that P.C. "couldn't walk," that her hair was a "mess," that

she was not wearing shoes, and that P.C.'s purse was "dumped out in the passenger seat."

{¶ 28} W.B.C. similarly testified that P.C. called J.C. "so upset" and told him that she had just been raped. W.B.C. testified that she and J.C. then left their house to go find P.C. and take her to the hospital. W.B.C. testified that during this time she stayed on the phone with P.C. who was "hysterical, crying, sobbing, scared." Also explaining what she saw when first contacting P.C., W.B.C. testified:

> When we pulled up, [J.C.] pulled up on her passenger's side. And he jumped out and went around to her. And when I got out and around the truck, [P.C.] was trying to stand holding onto the door and the car and crying. And [J.C.] was helping hold her up. And he was trying to talk to her. * * * She was saying, I just want to go home. I just want to go home. I'm so sorry. And I just want to go home. But she was trying to stand.

{¶ 29} Continuing, W.B.C. testified:

> So [J.C.] couldn't get her to walk, so he threw her over his shoulder like a bag of potatoes or something, and took her to the car, buckled her in my passenger's seat. And while he was doing that, I got in the car and grabbed her shoes, her purse, everything that she dumped out of her purse, her wallet, and everything in case she needed her insurance card.

{¶ 30} W.B.C. also testified that P.C. "had a bloody nose, her hair was a mess, her clothes were disheveled," and "she didn't have shoes on." W.B.C. further testified that "when we got there and I walked around the car and I saw [P.C.], I knew that something happened." When asked if it seemed "significant" to see P.C. in such a state, W.B.C. testified, "Yes." This is because, according to W.B.C., "[P.C.] does not leave the house, even for the grocery store, without fixing herself up. She's always put together – jewelry and all."

{¶ 31} Once at the hospital, P.C. testified that she had a panic attack and felt like she had "been ran over by a truck." One of the two nurses who treated P.C. for her injuries additionally testified P.C. appeared "[t]earful, drowsy," and "very sleepy." The second of

the two nurses who treated P.C. for her injuries also testified that P.C. was "tearful," that she "felt awful," and that she was "embarrassed." This same nurse further testified that P.C. was "freaking out" and that it was apparent that P.C. had been "given something to make her incapacitated, because of the blackout." The state's expert witness, the chief toxicologist with the Hamilton County Coroner's Office, also testified that P.C.'s blood-alcohol level would have been between .128 and .198 at the time she was raped, both of which are well over the legal limit of .08.

{¶ 32} In his defense, Kaufhold testified and refuted P.C.'s testimony claiming that the sex between them was consensual. Although acknowledging that P.C. was a "little tipsy" and "stumbled for a second" getting up from the table at the restaurant during their dinner date, Kaufhold also testified that there was no reason for him to believe P.C.'s ability to resist or consent was substantially impaired prior to having sex when she had drank, at most, three alcoholic beverages.

{¶ 33} Given the jury's verdict, the jury clearly did not find Kaufhold's testimony credible. As the trier of fact, this was well within the jury's province. That Kaufhold's testimony contradicted the testimony offered by the state does not mean the jury's verdict was based on insufficient evidence. *See State v. Gross*, 12th Dist. Preble No. CA2018-01-001, 2018-Ohio-4557, ¶ 18, 29 (appellant's conviction for rape was supported by sufficient evidence where the victim testified that she woke up, face down on the couch, with her underwear and jeans around her ankles while appellant was on top of her, naked, "humping her from behind").

{¶ 34} It also does not mean the jury's verdict was against the manifest weight of the evidence. This is because "[a] conviction is not against the manifest weight of the evidence simply because the trier of fact believed the testimony offered by the prosecution." *State v. Lunsford*, 12th Dist. Butler No. CA2019-07-116, 2020-Ohio-965, ¶ 14, citing *State v.*

*Crossty*, 12th Dist. Clermont Nos. CA2017-01-003 thru CA2017-01-005, 2017-Ohio-8267, ¶ 68. That is to say, "[w]hen there is a conflict in the testimony of witnesses, it is for the trier of fact to determine the weight and credibility to be given to such evidence." *State v. Marcum*, 12th Dist. Butler No. CA2017-05-057, 2018-Ohio-1009, ¶ 31, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶ 35} This holds true irrespective of whether Kaufhold gave P.C. something to make her physically incapacitated, whether it was a combination of P.C.'s medication and alcohol that hindered her ability to resist, or whether it was the alcohol alone that caused P.C. to black out and wake up feeling like she had "been ran over by a truck." The fact remains that the state presented extensive evidence to prove beyond a reasonable doubt that Kaufhold knew, or had reason to believe, that P.C. was substantially impaired prior to having sex. Therefore, because the state presented more than enough evidence to prove Kaufhold guilty behind a reasonable doubt, the jury's verdict finding Kaufhold guilty of rape and sexual battery was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, finding no merit to any of the arguments raised herein, Kaufhold's first assignment of error is overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE COURT ERRED BY SUSTAINING THE STATE'S OBJECTION TO QUESTIONS ABOUT THE STATE'S COMPLAINANT'S FINANCIAL HISTORY.

{¶ 38} In his second assignment of error, Kaufhold argues the trial court violated his right to confront his accuser and fundamentally impaired his ability to present his defense when it prohibited him from cross-examining P.C. about her alleged "financial difficulties" when questioning her about any possible motive she may have for "fabricating the allegations" against him. However, as the record indicates, Kaufhold had already cross-examined P.C. about her finances to the full extent that he intended prior to the state's

- 11 -

objection. Kaufhold in fact specifically notified the trial court at sidebar that he had already reached "the extent of [his] questions" by the time the state objected. Therefore, when considering Kaufhold was permitted to question P.C. about her "financial difficulties" to the full extent that he intended before the state objected, Kaufhold cannot show that his right to confront his accuser was violated. Nor can Kaufhold show that his ability to present his defense was fundamentally impaired. The record instead indicates that Kaufhold did exactly what he intended to do with this line of questioning; i.e., imply that P.C. had made up the allegations against him in hopes that she would receive a significant financial payout. Accordingly, finding no error in the trial court's decision, Kaufhold's second assignment of error lacks merit and is overruled.

{¶ 39} Assignment of Error No. 3:

{¶ 40} THE COURT ERRED IN FAILING TO CURE THE STATE'S PREVALENT MISCONDUCT.

{¶ 41} In his third assignment of error, Kaufhold argues the state engaged in several instances of prosecutorial misconduct that denied him a fair trial. We disagree.

{¶ 42} "For a conviction to be reversed because of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights." *State v. Harner*, 12th Dist. Clinton No. CA2019-05-011, 2020-Ohio-1184, ¶ 29, citing *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. To demonstrate prejudice, a defendant must show that the improper acts were so prejudicial that the outcome of the trial would clearly have been different had those improper acts not occurred. *State v. Jones*, 12th Dist. Butler No. CA2006-11-298, 2008-Ohio-865, ¶ 21.

{¶ 43} The focus of "an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon the culpability of the prosecutor." *State v. Gray*, 12th Dist.

Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. Prosecutorial misconduct "is not grounds for error unless the defendant has been denied a fair trial." *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27. "The accused is to be given a fair trial, not a perfect trial." *State v. Kaaz*, 12th Dist. Clinton No. CA2016-05-010, 2017-Ohio-5669, ¶ 102, citing *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357 (1974); *State v. Landrum*, 53 Ohio St.3d 107, 112 (1990) (noting that a defendant is not guaranteed an "error free, perfect trial").

{¶ 44} Kaufhold initially argues the state engaged in prosecutorial misconduct when it "fabricated evidence" during its closing argument when it argued that P.C. "could" have suffered "a blackout" as a result of her combining her medication with alcohol. However, as a simple review of the record reveals, that is exactly what the state's expert witness, the chief toxicologist with the Hamilton County Coroner's Office, testified to as part of the state's case-in-chief. Specifically, when asked if P.C.'s act of combining her medications with alcohol would account for her blacking out, the toxicologist testified that it was "possible" that the combination caused P.C. to suffer "unconsciousness or memory loss."

{¶ 45} The word "possible" is defined by the Merriam-Webster online dictionary as "being within the limits of ability, capacity, or realization." Similarly, the word "could" is defined by the Merriam-Webster online dictionary as the past tense of the word "can," which is separately defined as being "physically or mentally able to." Testifying that something was "possible" is essentially the same as testifying that something "could" have happened. Or, as applied to the facts of this case, the toxicologist testifying that it was "possible" that P.C.'s "unconsciousness or memory loss" was caused by her combining medication with alcohol is essentially the same as the state arguing during its closing argument that P.C. "could" have suffered "a blackout" when she combined her medication with alcohol. Therefore, Kaufhold's claim alleging the state engaged in prosecutorial misconduct when it

"fabricated evidence" during its closing argument by stating P.C. "could" have suffered "a blackout" as a result of her combining medication with alcohol lacks merit.

{¶ 46} Kaufhold also argues the state engaged in prosecutorial misconduct when it "misstated the evidence" and "misled the jury" throughout the trial and during its closing argument by improperly inferring that he may have given P.C. some type of "date rape drug" prior to having sex when there was no evidence to corroborate this "theory."

{¶ 47} Kaufhold's argument, however, is nothing more than a challenge to the organizational effectiveness in which the state presented its case. The fact that the state was able to present a compelling case that convinced the jury of Kaufhold's guilt beyond a reasonable doubt does not mean the state engaged in prosecutorial misconduct. There was also nothing improper about the state commenting on "what the evidence has shown and what reasonable inferences may be drawn therefrom" during its closing argument. *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). This includes the possibility that Kaufhold may have given P.C. some type of "date rape drug" prior to having sex. Therefore, Kaufhold's claim alleging the state engaged in prosecutorial misconduct when it "misstated the evidence" and "misled the jury" by improperly inferring that he may have given P.C. some type of "date rape drug" lacks merit.

{¶ 48} Kaufhold next argues the state engaged in prosecutorial misconduct when it "misstated the law" by "misstating the allegations" in the bill of particulars when it notified the jury during its closing argument that it was not required to prove beyond a reasonable doubt exactly what incapacitating substance(s) caused P.C. to become substantially impaired in order to secure a conviction for rape in violation of R.C. 2907.02(A)(1)(c). However, despite Kaufhold's claims, the record is clear that the state restricted its proof to the indictment and the allegations set forth in the bill of particulars. That is to say, the state restricted its case to proving beyond a reasonable doubt that Kaufhold had sex with P.C.

when her ability to resist or consent was substantially impaired as a result of her becoming intoxicated by drugs and/or alcohol when he knew or had reasonable cause to believe that her ability to resist or consent was substantially impaired.

{¶ 49} Exactly what incapacitating substance(s) caused P.C. to become substantially impaired that evening, be it drugs, alcohol, or a combination of both, was not an element of the offense that the state was required to prove. That is, stated differently, proof that P.C. consumed a specific type of alcohol along with a specific type of drug is not an element that needed to be proven to secure a conviction for rape in violation of R.C. 2907.02(A)(1)(c). Therefore, Kaufhold's claim that the state engaged in prosecutorial misconduct when it "misstated the law" by "misstating the allegations" in the bill of particulars during its closing argument when it notified the jury that it was not required to prove beyond a reasonable doubt exactly what caused P.C. to become substantially impaired in order to secure a conviction for rape in violation of R.C. 2907.02(A)(1)(c) lacks merit. Accordingly, finding no merit to any of the arguments raised by Kaufhold herein, Kaufhold's third assignment of error is overruled.

{¶ 50} Assignment of Error No. 4:

{¶ 51} MR. KAUFHOLD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 52} In his fourth assignment of error, Kaufhold argues he received ineffective assistance of counsel. We disagree.

{¶ 53} "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Burns*, 12th Dist. Clinton No. CA2013-10-019, 2014-Ohio-4625, ¶ 7, citing *State v. Hendrix*, 12th Dist. Butler No. CA2012-05-109, 2012-Ohio-5610, ¶ 14. To prevail on an ineffective assistance of counsel claim, Kaufhold must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and that (2) he was

prejudiced as a result. *State v. Ward-Douglas*, 12th Dist. Warren No. CA2011-05-042, 2012-Ohio-4023, ¶ 96, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 693, 104 S.Ct. 2052 (1984).

{¶ 54} In order to demonstrate prejudice, Kaufhold must establish that, but for his trial counsel's errors, there is a reasonable probability that the result of trial would have been different. *State v. Kinsworthy*, 12th Dist. Warren No. CA2013-06-053, 2014-Ohio-1584, ¶ 42. A "reasonable probability" is a probability that is "sufficient to undermine confidence in the outcome." *State v. Burke*, 97 Ohio St.3d 55, 2002-Ohio-5310, ¶ 6, quoting *Strickland* at 694. The failure to make an adequate showing on either prong is fatal to an ineffective assistance of counsel claim. *State v. Zielinski*, 12th Dist. Warren No. CA2010-12-121, 2011-Ohio-6535, ¶ 50.

{¶ 55} Kaufhold initially argues he received ineffective assistance of counsel when his trial counsel failed to object to the "numerous" alleged instances of prosecutorial misconduct discussed more fully above in his third assignment of error. However, because this court has already determined that Kaufhold's arguments alleging the state engaged in "numerous" instances of prosecutorial misconduct lacked merit, we also find no merit to Kaufhold's claim that his trial counsel was deficient for failing to object to the "numerous" alleged instances of prosecutorial misconduct addressed within our discussion of the third assignment of error.

{¶ 56} Kaufhold also argues he received ineffective assistance when his trial counsel allowed Kaufhold to testify in his own defense, thereby "subjecting [him] to a detrimental cross-examination without potential benefit." However, as this court has stated previously, which defense to pursue at trial is a matter of trial strategy. *Kinsworthy*, 2014-Ohio-1584 at ¶ 43, citing *State v. Murphy*, 91 Ohio St.3d 516, 524 (2001). "This includes the decision as to whether to call the defendant to testify on his [or her] own behalf." *State v. Gearhart*,

12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 24, citing *State v. Huber*, 8th Dist. Cuyahoga No. 98128, 2013-Ohio-97, ¶ 9 ("[a] decision regarding whether to call a defendant to testify on his own behalf during the course of trial is a matter of trial strategy"); *see, e.g., Cleveland v. Jordan*, 8th Dist. Cuyahoga No. 103451, 2016-Ohio-4957, ¶ 20 (appellant's ineffective assistance of counsel claim lacked merit because the decision whether to call appellant to testify on her own behalf was "a matter of trial strategy that we cannot second-guess on appeal").

{¶ 57} That the trial strategy used to defend against the charges was ultimately unsuccessful does not amount to ineffective assistance of counsel. *State v. Davis*, 12th Dist. Butler No. CA2012-12-258, 2013-Ohio-3878, ¶ 25. This makes sense when considering "[t]he ultimate decision of whether a defendant will testify on his own behalf is the defendant's." *State v. Ryan*, 6th Dist. Wood No. WD-05-064, 2006-Ohio-5120, ¶ 24, citing *State v. Edwards*, 119 Ohio App.3d 106, 109 (10th Dist.1997). This holds true even if, like here, that decision may have hindered trial counsel's overall defense strategy that (1) the sex was consensual or (2), if not consensual, that there was no evidence to indicate Kaufhold either knew or had reasonable cause to believe P.C.'s ability to resist or consent was substantially impaired as a result of her becoming intoxicated by drugs and/or alcohol prior to having sex. Therefore, Kaufhold's claim that he received ineffective assistance when his trial counsel allowed him to testify in his own defense lacks merit.

{¶ 58} Kaufhold next argues that he received ineffective assistance when trial counsel failed to object to the state asking Kaufhold how many first dates with women he met online ended with them having sex, as well as for allowing his prior conviction for operating a motor vehicle while under the influence of alcohol be revealed to the jury. But, contrary to Kaufhold's claim, "[t]rial counsel is not ineffective for choosing, for tactical reasons, not to pursue every possible trial objection." *State v. Raypole*, 12th Dist. Fayette

No. CA2014-05-009, 2015-Ohio-827, ¶ 24. That is to say, the "[f]ailure to make objections does not automatically constitute ineffective assistance of counsel * * * ." *State v. Homer*, 12th Dist. Warren No. CA2003-12-117, 2006-Ohio-1432, ¶ 15, citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 168. This is because "[o]bjections tend to disrupt the flow of a trial and are considered technical and bothersome by a jury." *State v. Steele*, 12th Dist. Butler No. CA2003-11-276, 2005-Ohio-943, ¶ 100, citing *State v. Hill*, 75 Ohio St.3d 195, 211 (1996). That would certainly have been the case here when considering this evidence carried little weight, if any, as it relates to the serious nature of the charges Kaufhold faced. Kaufhold's claim otherwise lacks merit.

{¶ 59} Kaufhold additionally argues that he received ineffective assistance when trial counsel failed to file a motion to suppress the "phone location records illegally obtained" from his phone without a search warrant in violation of the United States Supreme Court's decision in *Carpenter v. United States*, __ U.S. __, 138 S.Ct. 2206 (2018). However, as the record indicates, a search warrant was obtained for Kaufhold's phone prior to the phone being searched and his phone's location records being seized. The search warrant, as well as the phone location records obtained in connection with the search warrant, was then provided to Kaufhold's trial counsel in discovery. Therefore, Kaufhold's claim that he received ineffective assistance of counsel when his trial counsel failed to file a motion to suppress his phone's location records lacks merit.

{¶ 60} Kaufhold finally argues that he received ineffective assistance when his trial counsel failed to "investigate or even inquire about" the DNA of an unknown male found in P.C.'s underwear. But, when considering Kaufhold admitted to having sex with P.C., the fact that the DNA of an unknown male was found in P.C.'s underwear was not pertinent to his trial counsel's trial strategy that, as noted above, (1) the sex was consensual or (2), if not consensual, that there was no evidence to indicate Kaufhold either knew or had

reasonable cause to believe P.C.'s ability to resist or consent was substantially impaired. "[T]rial strategy, even debatable strategy, is not a basis for finding ineffective assistance of counsel." *State v. Woody*, 12th Dist. Clinton No. CA2019-01-001, 2020-Ohio-621, ¶ 10. Therefore, Kaufhold's claim that he received ineffective assistance when his counsel failed to "investigate or even inquire about" the DNA of an unknown male found in P.C.'s underwear lacks merit. Accordingly, finding no merit to any of the arguments raised by Kaufhold herein, Kaufhold's fourth assignment of error is overruled.

{¶ 61} Assignment of Error No. 5:

{¶ 62} CUMULATIVE ERROR.

{¶ 63} In his fifth assignment of error, Kaufhold argues his conviction must be reversed under the "cumulative error" doctrine. Pursuant to the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. McClurkin*, 12th Dist. Butler No. CA2007-03-071, 2010-Ohio-1938, ¶ 105. So, in order for the cumulative error doctrine to apply, "an appellate court must find that multiple errors, none of which individually rose to the level of prejudicial error, actually occurred in the trial court." *State v. Cramer*, 12th Dist. Butler No. CA2003-03-078, 2004-Ohio-1712, ¶ 67, citing *State v. DeMarco*, 31 Ohio St.3d 191, 197 (1987). However, as discussed more fully above, no such error, harmless or otherwise, occurred here. Therefore, because this court has found no merit to any of Kaufhold's assignments of error discussed above, Kaufhold cannot demonstrate cumulative error. *State v. Hoop*, 12th Dist. Brown No. CA2011-07-015, 2012-Ohio-992, ¶ 59. Accordingly, finding the cumulative error doctrine inapplicable to the case at bar, Kaufhold's fifth assignment of error lacks merit and is overruled.

{¶ 64} Assignment of Error No. 6:

{¶ 65} THE COURT ERRED BY SENTENCING MR. KAUFHOLD TO A MANDATORY SEVEN YEAR INCARCERATION TERM.

{¶ 66} In his sixth assignment of error, Kaufhold takes exception to the mandatory nature of his seven-year prison sentence imposed by the trial court for rape in violation of R.C. 2907.02(A)(1)(c). However, pursuant to R.C. 2929.13(F)(2), a sentence imposed for "any rape, regardless of whether force was involved and regardless of the age of the victim," is mandatory by operation of law. *See, e.g., State v. Vancleve*, 12th Dist. Clermont No. CA2016-06-039, 2016-Ohio-7546, ¶ 13 (a trial court is required to impose a mandatory prison term for a rape conviction in accordance with R.C. 2929.13[F][2]); *State v. Nian*, 5th Dist. Delaware No. 15CAA070052, 2016-Ohio-5146, ¶ 43 (a rape conviction carries with it a mandatory prison term under R.C. 2929.13[F][2] "whereby the defendant is ineligible for judicial release"). Therefore, because any rape, regardless of whether force was involved and regardless of the age of the victim, carries with it a mandatory prison term pursuant to R.C. 2929.13(F)(2), the trial court did not err by ordering Kaufhold to serve a mandatory seven-year prison term when sentencing him for rape in violation of R.C. 2907.02(A)(1)(c). Accordingly, finding no error in the trial court's decision, Kaufhold's sixth assignment of error lacks merit and is overruled.

{¶ 67} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.